UNITED STATES of America Ex. rel. Seydou DIOP, and Seydou Diop, individually, Plaintiff,

v.

WAYNE COUNTY COMMUNITY COLLEGE DISTRICT, et al., Defendants.

No. 00–CV–74992–DT.

United States District Court, E.D. Michigan, Southern Division.

Jan. 31, 2003.

OPINION AND ORDER REGARDING
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

ROSEN, District Judge.

## I. INTRODUCTION

This False Claims Act/Section 1983/Michigan Elliott–Larsen action is presently before the Court on Defendants' Motion for Summary Judgment. Plaintiff has responded to Defendants' Motion to which Response Defendants have replied. Having reviewed and considered the parties' briefs and supporting evidence, and having heard the oral arguments of counsel on January 9, 2003, the Court is now prepared to rule on this matter. This Opinion and Order sets forth the Court's ruling.

## II. FACTUAL BACKGROUND

*THE PARTIES*

Plaintiff Seydou Diop is an African male who was born in the Republic of Guinea. Since August 1975, Mr. Diop has been employed as a part-time chemistry professor by Defendant Wayne County Community College District (referred to herein as "WCCCD" or the "College").

WCCCD operates five campuses: the Western Campus in Belleville; the Downriver Campus in Taylor; the Northwest Campus on Greenfield; the Eastern Campus; and the Downtown Campus. The College offers a comprehensive college curriculum including liberal arts and vocational-technical programs.

WCCCD offers 2,500 individual course selections per year in more than 50 departments. The chemistry department is one such department. The College offers seven different chemistry courses each year. These are Chem 105—general high school chemistry; Chem 136—general chemistry college course; Chem 145—the second general chemistry college course; Chem 155—a survey of biochemistry and organic chemistry; Chem 250—organic chemistry lecture; Chem 252—organic chemistry lecture; and Chem 255—organic chemistry lab and lecture. Five of these courses— Chem 105, 136, 145, 155 and 255—include labs. Each of the College's five campuses

maintain chemistry labs. However, only the Downtown Campus has an organic chemistry lab.

As a part-time faculty member, Plaintiff Diop's employment with WCCCD is covered by a collective bargaining agreement ("CBA") entered into between the College and Local 2000 of the American Federation of Teachers (the "AFT" or the "Union"). In addition to his part-time teaching position at WCCCD, at all times relevant to this action, Plaintiff also worked as an environmental consultant with a private company, Chemical & Environmental Engineering, Inc.[1]

Defendants Frank Hayden, Larry K. Lewis, Mary Ellen Stempfle, Charles Paddock, Juanita Ford, Myron Wahls, Jr., Denise Wellons–Glover, Edward D. Clemente and Michael Reddy are members of Defendant Wayne County Board of Trustees (the "Board"), which is the governing body of WCCCD. Defendant Curtis L. Ivery is the Chancellor of WCCCD. Defendant Janet Dettloff is the Assistant Dean of Instruction and Chairperson of the Department of Life and Physical Sciences of WCCCD.

*THE POSTING OF A FULL–TIME FACULTY POSITION*

In February 2000, in accordance with the requirements of the AFT Collective Bargaining Agreement, WCCCD posted a job notice for a full-time chemistry faculty position. Dr. Dettloff sent copies of the posting to all part-time instructors. The job notice specified that to be minimally qualified, the applicant needed to have a Master's degree in the subject area and directed that all applications were to be sent to the Human Resources Department. [*See* Plaintiff's Ex. N.] Dr. Dettloff testified that she wanted the new full-time faculty member to be in place for the fall, 2000 semester.

Once the full-time chemistry position was posted, a Selection Committee was appointed jointly by the Chancellor and the Teacher's Union. That Committee, by District policy, included members of the three unions which represented College employees: the AFT, the UAW, and the Professional and Administrators Association (the "P & AA"). With respect to the selection of the new full-time chemistry professor, the Committee consisted of Willie Brown, an African–American Lab Technician/Coordinator who was a member of the UAW; Norm Samuelson, a white male AFT member; Cliff Lewis, an African–American AFT member; Dr. Jacqueline Hodges, an African–American female administrator; and Dr. Dettloff.[2]

The Committee's initial screening eliminated those applicants who did not have a Master's degree in the field and relevant teaching experience. Dr. Dettloff testified that all part-time instructors who applied, including Plaintiff, were advanced to the next step of the screening process and were granted an interview.[3]

---

1. According to the Michigan Secretary of State's records, Chemical and Environmental Engineering, Inc. is owned by Plaintiff Seydou Diop. [*See* Corporate and Business Records on Westlaw's CORP–MI database.]

2. William Mott, a part-time biology instructor who was at the time the AFT Union Steward at the College, was also invited to serve on the Committee and asked to act as Chairperson of the Committee, but he declined to do.

3. Consistent with the CBA's requirement that qualified part-time faculty members be given "primary consideration" with respect to filling full-time vacancies [*see* Plaintiff's Ex. O], Dr. Dettloff testified that it was her policy to provide any part-time instructor who applied with an opportunity to be interviewed for any full-time openings within the Life and Physical Science Department. Plaintiff Diop was among several part-time instructors who met the minimum qualifications and was therefore automatically entitled to an interview.

The next step in the screening process involved arranging interviews with the candidates who met minimal qualifications. All of the members of the Selection Committee had agreed to set aside August 10 and 11, 2000 for completing the interviews.

The ministerial task of contacting the 15 or 16 candidates selected by the Selection Committee for interviews, however, was not handled by any of the Selection Committee members. Rather, that task was handled by the Human Resources Department. Human Resources Director Mark Sanford testified that he and several members of his staff were responsible for contacting the candidates for the full-time chemistry position. Plaintiff Diop was one of the candidates that Mr. Sanford himself contacted. Sanford, an African–American, testified that he did not know Mr. Diop and his having been the person who contacted Diop was a random act done simply to assist his staff in completing the scheduling process in a timely manner.

Sanford testified that when he reached Mr. Diop, he advised him of the two days available for him to interview with the Selection Committee but that Mr. Diop said he was not available either of those days. (Plaintiff's testimony varies from Sanford's in that he claims that Sanford only offered him one date to interview, not two. However, he does not dispute that he told Sanford that he was not available to interview on the date offered.) [4]

The Selection Committee then proceeded with the interviews. As it turns out, only seven candidates made themselves available for interviews so all of the interviews were completed in one day, August 10, 2000. The interviews were conducted by Dr. Dettloff, Willie Brown, Norm Sam-uelson, and Cliff Lewis. Dr. Hodges concurred in the Committee's final recommendation although she did not participate in the interviews. Plaintiff Diop was not interviewed because he did not make himself available for an interview.

*THE SELECTION*

After the interviews, each candidate was individually scored by each member of the Committee on a standardized format. The scores were totaled and averaged, and the two best candidates were recommended to the Chancellor for appointment. Chancellor Ivery, who himself is an African–American, ultimately chose Dr. Joann Wittbrodt. Dr. Wittbrodt, a white female, was, like Plaintiff, a part-time chemistry instructor at WCCCD. She also taught at Wayne State University. Dr. Wittbrodt not only had a Ph.D. in chemistry from WSU, but also, she impressed the Committee members during the teaching demonstration component of her interview.

Shortly after Dr. Wittbrodt was hired, Plaintiff Diop complained to his Union that a white female was hired for the full-time chemistry position. However, the Union filed no grievance, apparently having concluded that there was no violation of the collective bargaining agreement.

Three months later, on November 13, 2000, Plaintiff filed this lawsuit claiming that Defendants' failure to schedule him for an interview for the full-time chemistry position was the result of gender, race and ethnicity/national origin discrimination in violation of the Michigan Elliott–Larsen Civil Rights Act and the Equal Protection Clause of the Fourteenth Amendment, and was also done in retaliation for his having complained of Defendants' "academic

---

**4.** Plaintiff testified that when Sanford contacted him he was working on a job for one of his consulting clients which required that he be present on the client's premises the entire day on the date offered by Sanford for an interview. (Plaintiff's customer, however, testified that Plaintiff was never at his facility the week of August 7–11, 2000 for more than a couple of hours. *See* Troy Warren Dep. Tr., Defendants' Ex. 7, p. 31.)

fraud" in accepting federal funds to enroll students in ill-equipped chemistry lab courses in violation of the False Claims Act, 31 U.S.C. § 3730(h).[5] Plaintiff further alleges that failure to afford him an interview for the full-time chemistry position violated his Fourteenth Amendment substantive and procedural due process rights. Additionally, Plaintiff has asserted a False Claims Act *qui tam* claim[6] in which he alleges that, over approximately fifteen years, the Defendants received federal funds through WCCCD's participation in federal student financial aid programs by falsely certifying that the College was in compliance with all applicable statutory and regulatory provisions and accreditation standards. Plaintiff contends that the College was not in compliance with these regulatory provisions and accreditation standards because certain chemistry labs were inadequately equipped.

Discovery has now closed and the Defendants have moved for summary judgment on all of Plaintiff's claims.

## III. *DISCUSSION*

### A. *STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT*

Summary judgment is proper " 'if the pleadings, depositions, answer to interrog-

atories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " Fed. R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[7] According to the *Celotex* Court,

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

After reviewing the above trilogy, the Sixth Circuit established a series of princi-

---

**5.** Although in his Complaint, Plaintiff alleged that his discrimination claim was predicated upon Defendants' "decision to reject his application to become a full-time instructor" and "failure to promote, or to even consider him for promotion," *see* Complaint, ¶¶ 59, 60, 64, in his Brief in Response to Defendants' Motion for Summary Judgment he states that he "agrees with Defendants that the adverse action suffered by Mr. Diop is their refusal to schedule Plaintiff for an interview with the Selection Committee," *see* Plaintiff's Response Brief, p. 16, and, indeed, it is only in the context of the failure to schedule him for an interview that Plaintiff presents his disparate treatment arguments. *See id.*, pp. 17–20; 24–25.

**6.** The Government has declined to intervene in Plaintiff's *qui tam* action. However, the FCA allows the realtor to maintain an action in the name of the United States, and if the realtor is successful in obtaining a monetary judgment in favor of the Government, he is entitled to 25–30% of the recovery, plus costs and attorney's fees. *See* 31 U.S.C. § 3730(b)(1) and (d)(2).

**7.** "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A Charles A. Wright, Arthur R. Miller, Mary Kay Kane, *Federal Practice & Procedure*, § 2727, at 35 (1996 Supp.).

ples to be applied to motions for summary judgment. They are summarized as follows:

* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Betkerur v. Aultman Hospital Association*, 78 F.3d 1079, 1087 (6th Cir.1996). *See also, Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989). The Court will apply the foregoing standards in deciding Defendants' Motion for Summary Judgment in this case.

**B.** *PLAINTIFF'S ELLIOTT–LARSEN CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS MUST BE DISMISSED*

As an initial matter, the Court finds that Plaintiff's Elliott–Larsen claims against individual Defendants Frank Hayden, Larry K. Lewis, Mary Ellen Stempfle, Charles Paddock, Juanita Ford, Michael Wahls, Jr., Denise Wellons–Glover, Edward D. Clemente, Michael Reddy, Dr. Curtis L. Ivery and Dr. Janet Dettloff must be dismissed.

In *Jager v. Nationwide Truck Brokers, Inc.*, 252 Mich.App. 464, 652 N.W.2d 503 (2002), the Michigan Court of Appeals determined that, notwithstanding the language of the Elliott–Larsen Civil Rights Act, individual defendants who are responsible for making personnel decisions affecting a plaintiff-employee cannot be held individually liable separate from the employer for actions toward the employee that violate the Act.[8] Based upon an examination of the statutory scheme and remedial provisions of the Michigan Act the *Jager* court determined that "the language in the definition of 'employer' concerning an 'agent' of the employer, was meant merely to denote respondeat superior liability, rather than individual liability." 252 Mich. App. at 484, 652 N.W.2d at 514–15. The court further noted that in examining Elliott–Larsen Act claims, Michigan courts frequently looked to federal decisions construing Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and took note that in *Wathen v. General Electric Co.*, 115

---

**8.** The Elliott–Larsen Act provides that

"An employer shall not . . . fail or refuse to hire or recruit, discharge or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition or privilege of employment, because of religion, race, color, national ori-

gin, age, sex, height, weight, or marital status."

M.C.L. § 37.2202(1)(a). "Employer" is defined in the statute as:

a person who has 1 or more employees, *and includes an agent of that person.*

M.C.L. § 37.2201(a).

F.3d 400, 403–406 (6th Cir.1997), the Sixth Circuit Court of Appeals similarly held that, notwithstanding the language of Title VII, individual supervisors and managers, who do not otherwise qualify as "employers" may not be held liable under the federal Act.[9] The *Jager* court found this federal authority persuasive and, after examining the Michigan Act's statutory scheme, concluded:

> Read as whole, the CRA envisions, in our opinion, employer liability for civil rights violations that result from the acts of its employees who have the authority to act on the employer's behalf rather than individual liability for this civil rights violations. Further, had our Legislature intended individual rather than employer liability under the CRA, it could have expressly stated so. Thus, we conclude that the CRA provides solely for employer liability, and a supervisor engaging in activity prohibited by the CRA may not be held individually liable for violating a plaintiff's civil rights.

252 Mich.App. at 485, 652 N.W.2d at 515.

In reaching its conclusion, the *Jager* court did acknowledge that 17 years earlier it had held that individual liability existed under the Elliott–Larsen Act in *Jenkins v. Southeastern Michigan Chapter,* *American Red Cross,* 141 Mich.App. 785, 369 N.W.2d 223 (1985). However, because the *Jager* court was not bound by that decision,[10] and because *Jenkins* relied on a federal district court decision, *Munford v. James T. Barnes & Co.,* 441 F.Supp. 459 (E.D.Mich.1977), which was, in the first place, not controlling and which has since been at least implicitly overruled by *Wathen,* the *Jager* court declined to follow *Jenkins.*

■■■ As a federal district court, this Court is bound by the decisions of Michigan's intermediate appellate courts unless it is convinced that the Michigan Supreme Court would decide the question differently. *See Comiskey v. Automotive Industry Action Group,* 40 F.Supp.2d 877, 891 (E.D.Mich.1999) (quoting *United of Omaha Life Ins. Co. v. Rex Roto Corp.,* 126 F.3d 785, 789 (6th Cir.1997)). Given the fact that the Michigan Supreme Court has recently observed, at least peripherally, that the reference to "agent" in the Elliott–Larsen Act's definition of employer "addresses an employer's vicarious liability," *see Chambers v. Trettco, Inc.,* 463 Mich. 297, 310 614 N.W.2d 910, 915 (2000), this Court cannot say that it is "convinced" that the Michigan Supreme Court would construe the Michigan statute differently than the Court of Appeals did in *Jager.*[11]

---

9. As the *Jager* court observed, the Sixth Circuit's holding in *Wathen* expresses the prevailing view of the majority of federal courts. *See* 252 Mich.App. at 480 n. 7, 652 N.W.2d 503 and cases cited therein.

10. *See* M.C.R. 7.215(I)(1) which provides in relevant part:
 (1) Precedential Effect of Published Decisions. A panel of the Court of Appeals *must* follow the rule of law established by a prior published decision of the Court of Appeals *issued on or after November 1, 1990,* that has not been reversed or modified by the Supreme Court, or by a special panel of the Court of Appeals as provided in this rule.

11. The Court acknowledges that although in *Comiskey, supra,* it declined to hold that individual employee/supervisors may not be held liable under the Michigan statute, *Comiskey* (which relied upon *Jenkins, supra*) pre-dates both *Jager* (which rejects *Jenkins*) and *Chambers.* As such, in refusing to limit liability under the Elliott–Larsen Act, the Court did not have the benefit of the Michigan courts' most recent rulings on this issue, and cannot, in view of those decisions, say it remains convinced that the Michigan Supreme Court would hold differently.

However, in reaching this decision, this Court does not necessarily endorse the Michigan Court of Appeals' interpretation of the language in the Elliott–Larsen Act in *Jager,* as it believes that the language "includes an agent of that employer," could, under princi-

*Jager* establishes that Plaintiff's Elliott–Larsen claims against the individual Defendants are not legally cognizable. Therefore, these claims will be dismissed.

## C. *PLAINTIFF HAS FAILED TO MAKE OUT A LEGALLY COGNIZABLE CLAIM OF GENDER OR NATIONAL ORIGIN DISCRIMINATION*

As indicated above, Plaintiff has alleged claims of gender and national origin discrimination under (1) the Michigan Elliott–Larsen Civil Rights Act and (2) 42 U.S.C. § 1983 under a theory of violation of the Equal Protection Clause of the Fourteenth Amendment.

It is well-established that the burden is on the employment discrimination plaintiff—under both federal and Michigan law—to establish a *prima facie* case of discrimination. *See Lautermilch v. Findlay City Schools*, 314 F.3d 271, 275 (6th Cir.2003); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Carden v. General Motors*, 156 Mich.App. 202, 210, 401 N.W.2d 273 (1986), *lv. den.*, 428 Mich. 891, 403 N.W.2d 811 (1987).

 An employment discrimination plaintiff can establish his claim of unlawful discrimination under Michigan's Elliott–Larsen Civil Rights Act either (1) by producing direct evidence of discrimination or (2) by presenting a *prima facie* case of discrimination in accordance with the *McDonnell Douglas/Burdine* framework established by the United States Supreme Court for use in Title VII cases. *Hazle v. Ford Motor Co.*, 464 Mich. 456, 462–63, 628 N.W.2d 515, 520–21 (2001); *Town v. Michigan Bell Telephone Co.*, 455 Mich. 688, 694–95, 568 N.W.2d 64, 67–68 (1997). Plaintiff here contends that he can make out his claim of discrimination under both theories.

### a. *Plaintiff Has Failed to Produce Direct Evidence of Gender, National Origin or Race Discrimination*

 "Direct evidence" of discrimination is "evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Hazle v. Ford Motor Co., supra,* 464 Mich. at 462, 628 N.W.2d at 520 (quoting *Jacklyn v. Schering Plough Healthcare Products Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999)). When a plaintiff can cite direct evidence of discrimination, the *McDonnell Douglas/Burdine* shifting burdens of proof are not applicable. *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985); *DeBrow v. Century 21 Great Lakes, Inc.*, 463 Mich. 534, 539, 620 N.W.2d 836, 838 (2001). The presentation of direct evidence is generally sufficient to submit the plaintiff's case to the jury. *Harrison v. Olde Financial Corp.*, 225 Mich.App. 601, 610, 572 N.W.2d 679 (1997).

 Turning to the instant action, as an initial matter, the Court notes that, although Plaintiff alleged in his Complaint violation of the Elliott–Larsen Civil Rights Act predicated upon gender, national ori-

---

ples of strict statutory construction, well be read as extending liability to individuals. Otherwise, this phrase is merely surplusage, as it adds nothing to the definitional scope of "employer," which itself defines the term "employer" as a person. But, for the same

concern about important principles of Federalism that the Court set out in *Comiskey* in deciding to follow *Jenkins,* it cannot simply ignore *Jager*'s different interpretation of the language.

gin and race discrimination, Plaintiff has produced no evidence whatsoever that would show that he was discriminated against by WCCCD or anyone in the administration of WCCCD because he is from the Republic of Guinea, and it appears that Plaintiff has now abandoned his national origin claim as well as his gender discrimination claim, and predicates his Elliott–Larsen claim entirely upon his allegations of race discrimination. In support of his contention that he can establish his claim through direct evidence of race discrimination, Plaintiff relies upon the following evidence.

First, Plaintiff relies upon Defendant Dettloff's deposition testimony regarding an incident which occurred sometime in the 1980s. Defendant Dettloff testified that she was teaching a biology class at that time and was trying to teach an anatomy unit on articulation of the joints. She testified that she was trying to convey to her students how the muscles and bones worked together to make this articulation possible and that if something happened to the muscles, the bones could not move without them, but her students were having difficulty understanding this. In an attempt to aid their understanding, she testified that she gave them the following illustration:

> So I discussed, or I told them back in Greek and Roman times and ancient times, if a slave ran away, frequently what the owner would do would be to cut the Achilles tendon so the foot could no longer articulate so they couldn't run. I thought that was a fairly good example.

[*See* Dettloff Dep., Plaintiff's Ex. H, p. 6.]

However, not all of Defendant Dettloff's students agreed with her belief that she had used a good example. Dettloff testified that when the class took a break, she had gone to the bathroom where she overheard a conversation between two of her students indicating that they were uncomfortable with her explanation; that they thought she was being insensitive to black students. Therefore, when the class reconvened she apologized to them. *Id.* Plaintiff believes that this incident demonstrates that Dettloff was predisposed to discriminate against blacks. [*See* Plaintiff's Brief, pp. 8–9.]

Plaintiff further relies on another staff member's criticism of Defendant Dettloff and remarks she made while speaking at Department staff meeting on "Faculty Organization Day" in August 2001. (Organization Day is a day when the college staff convenes prior to the start of the school year.) On Organization Day, Dettloff addressed the full Life and Physical Sciences Department staff (approximately 100 people) and spoke on the topic of "diversity and sensitivity." In her speech, Dettloff told the staff about her biology class "slave" incident as an example of something the instructor might think is harmless but which might be offensive to others:

> I was trying to explain to the faculty how sometimes you can take something that you think is perfectly harmless and fine and it offends people. So before you give examples, you should think about it very carefully in terms of diversity of the people in the classrooms.
>
> That's what I was trying to convey and I was using myself as an example of how I hadn't been as sensitive as I should have been. That's why I related the whole story to them.

[Dettloff Dep., Plaintiff's Ex. H, pp. 8–9.]

Plaintiff relies upon a letter written by William Anderson, an instructor in Dettloff's department, who criticized Dettloff's Organization Day speech as racist. Anderson wrote to Dettloff that her speech "convinced me, again, without any doubt that you are still racial, bias [sic] and

prejudice [sic] toward Blacks." [*See* Plaintiff's Ex. V; Plaintiff's Brief, pp. 9–10]. In Anderson's opinion, Dettloff used the slave example "to put blacks down, to belittle blacks, to impugn the black race among others." *Id.* He told Dettloff that her remarks "made me feel belittled, helpless, less than a man, put down as a black man, embarrassed, impugnated [sic], and discriminated against, among other things." *Id.*

Plaintiff also relies upon the October 14, 2002 Affidavit of a former part-time WCCCD instructor, William Mott, who is also African–American. *See* Plaintiff's Ex. C. Mott opines in his Affidavit that, based upon his experience as a part-time instructor, union steward and two-time unsuccessful applicant for full-time teaching positions at WCCCD, race is a significant factor that WCCCD considers in reviewing applicants for full-time teaching positions in the Department of Life and Physical Sciences, and that in his opinion, Dr. Janet Dettloff is a racist. [Mott Aff., ¶¶ 8, 10]. By way of example, Mott states that WCCCD has a requirement that its instructors have at least a master's degree in the field in which they are to teach. He states that with respect to one of the full-time biology positions for which he had been an unsuccessful applicant, a white female with a master's degree in education and teaching was hired. *Id.* ¶¶ 11–12. Mott's position apparently is that an master's degree in education, even if it is in science education, is not related to biology, and therefore, the hiring of the white female applicant instead of him was racially motivated. With respect to the second full-time biology instructor position Mott had applied for, he states that he was initially offered the position but that it was subsequently withdrawn because WCCCD was experiencing financial difficulty. *Id.* ¶ 14. Mott apparently views the withdrawal of the offer as racially motivated because one month after his full-time fac-

ulty offer was withdrawn, the College hired a white man as a college recruiter, a non-instructional position. *Id.* ¶ 14.

■ Plaintiff contends that the foregoing evidence amounts to "direct evidence" of discrimination. As indicated above, direct evidence has been defined in this context as evidence that, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor. Direct proof of discriminatory animus, thus, includes such things as racial slurs and comments about a person's age or gender made by decision makers. *Lamoria v. Health Care & Retirement Corp.,* 230 Mich.App. 801, 807–811, 584 N.W.2d 589 (1998), *vacated but reinstated by conflict panel,* 233 Mich.App. 560, 593 N.W.2d 699 (1999). For example, statements such as "If I have to, I will get rid of the older guys—you older guys and replace you with younger ones," made by a decision maker, have been held to constitute "direct evidence" of discrimination. *See Downey v. Charlevoix Co. Bd. of Road Commissioners,* 227 Mich.App. 621, 633, 576 N.W.2d 712 (1998).

■ However, statements by decision makers that are unrelated to the employment decision at issue do not constitute direct evidence that unlawful discrimination was a determining factor in the employer's decision. *Wells v. New Cherokee Corp.,* 58 F.3d 233, 237–238 (6th Cir.1995); *McCarthy v. Kemper,* 924 F.2d 683, 686–687 (7th Cir.1991); *Harrison v. Olde Financial Corp.,* 225 Mich.App. 601, 608, n. 7, 572 N.W.2d 679 (1997); *Hatmaker v. Xerox,* 1998 WL 1991212, *3 (Mich.App. 1998). Rather, to qualify as direct evidence of discrimination, such remarks must relate to the employment decision at issue. *McCarthy, supra* at 686; *Hatmaker, supra.* Comments that are isolated or ambiguous or remote in time in relation to the employment decision at issue generally

have been held not to constitute direct evidence. *See Foster v. Tweddle Litho Co.*, 2002 WL 207575, *1 (Mich.App.2002), citing *Krohn v. Sedgwick James of Michigan, Inc.*, 244 Mich.App. 289, 297–300, 624 N.W.2d 212 (2001).

Applying the foregoing authorities in this case, it is clear that the evidence relied upon by Plaintiff does not amount to "direct evidence" of discrimination. With respect to Defendant Dettloff's statements to her biology class sometime in the 1980s, not only are the statements remote in time but also they had absolutely nothing to do with the interviewing for, or the filling of, the full-time chemistry position in August 2000. The same is true with respect to the August 2001 Organization Day speech, which occurred a year *after* the disputed employment action. Similarly, Mr. Mott's Affidavit offers nothing more than his own subjective opinion of racism at WCCCD. Simply stated, the evidence proffered by Plaintiff is not "evidence that, if believed, *requires the conclusion* that unlawful discrimination was at least a motivating factor in the adverse employment decision." *Harrison, supra* at 610, 572 N.W.2d 679. If anything, at best, the evidence Plaintiff relies upon would require an *inference* to reach that conclusion. *Hatmaker v. Xerox, supra.* It, therefore, is not "direct evidence" of racial discrimination.

Perhaps equally as important here, however, is the fact that the decision to hire a different candidate for the full-time position was not Dr. Dettloff's alone and, indeed, she was not the final decision-maker. Rather, she was simply one member of a joint union-administration selection committee consisting of five members, three of whom were African–American. The Selection Committee recommended two candidates to Chancellor Ivery, who himself is African–American, and he made the final selection. Finally, if the Court looks only at the alleged failure to schedule an inter-

view for the Plaintiff as being the adverse action in question, that failure was the action of Human Resources Director Mark Sanford, who himself is African–American, to whom the interview scheduling process was delegated.

Thus, even if Dr. Dettloff's 1980s comments could somehow be found to exhibit some direct evidence of racial animus—as noted, itself a highly doubtful proposition—Dr. Dettloff cannot be said to be the decision-maker in this case, nor even a primary decision-maker. the Court addresses this factor further in the analysis of Plaintiff's *prima facie* case, *infra.*

b. *Plaintiff's Claims of Race Discrimination Under the McDonnell Douglas/Burdine Framework.*

Where the plaintiff has no direct evidence of impermissible bias, in order to avoid summary judgment, he must proceed through the steps set forth in *McDonnell Douglas. Hazle, supra,* 464 Mich. at 462, 628 N.W.2d at 520. The *McDonnell Douglas* approach allows a plaintiff "to present a rebuttable *prima facie* case on the basis of proofs from which a factfinder could infer that the plaintiff was the victim of unlawful discrimination." *Id.* (quoting *DeBrow v. Century 21 Great Lakes, Inc., supra,* 463 Mich. at 537–38, 620 N.W.2d 836).

To establish an Elliott–Larsen discrimination claim using the *McDonnell Douglas* framework, a plaintiff is required to present evidence that (1) he belongs to a protected class, (2) he suffered an adverse employment action, (3) he was qualified for the position, and (4) the job was given to another person under circumstances giving rise to an inference of unlawful discrimination. *Hazle, supra,* 464 Mich. at 463–464, 628 N.W.2d 515, *Lytle v. Malady (On Rehearing),* 458 Mich. 153, 172–73, 579 N.W.2d 906, 913 (1998). If the plaintiff

successfully proves a *prima facie* case, the burden of production shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employment decision. *Hazle, supra; Lytle, supra; McDonnell Douglas, supra, Burdine, supra.* Once the employer carries this burden, the burden of production shifts back to the plaintiff to show by a preponderance of the evidence that the legitimate reasons offered by the employer were not its true reasons, but rather were a pretext for unlawful discrimination. *Hazle, supra* at 465–66, 628 N.W.2d 515; *Town, supra,* at 698, 568 N.W.2d 64; *Lytle, supra,* at 175–76, 579 N.W.2d 906. *Burdine, supra,* 450 U.S. at 253, 101 S.Ct. 1089.[12]

█ Plaintiff here maintains that he has satisfactorily established a *prima facie* claim because, by virtue of his national origin and race, he is a member of protected class, he was qualified for the position of full-time chemistry instructor and he was rejected for that position in favor of a white female. [*See* Plaintiff's Brief, p. 15.][13] It cannot be disputed that Plaintiff has satisfied the first three elements of a *prima facie* case—Plaintiff is black, he was qualified for the full-time position, and he suffered an adverse employment action: he did not get the position. However, under Michigan law, merely showing that the position the plaintiff sought was given to a non-minority candidate is insufficient to establish a *prima facie* Elliott–Larsen claim of discrimination. *See Hazle v. Ford Motor Company, supra.*

The African–American plaintiff in *Hazle,* like Plaintiff Diop in this case, challenged her employer's decision to promote a white individual instead of her as racially motivated. The trial court granted the defendant-employer's motion for summary disposition but the Court of Appeals reversed that ruling. The Michigan Supreme Court, however, reversed the Court of Appeals' decision and reinstated the trial court's grant of summary judgment. Specifically at issue in *Hazle,* was whether the plaintiff had satisfied the third and fourth elements of a *prima facie* case, i.e., whether she had shown that she was "qualified for the position" and that "the job was given to another person under circumstances giving rise to an inference of unlawful discrimination." 464 Mich. at 467, 628 N.W.2d at 523 (quoting *Lytle v. Malady, supra,* 458 Mich. at 172–73, 579 N.W.2d 906.)

The *Hazle* Court first rejected the defendant's argument that, in a failure to promote case, to satisfy the third element of a *prima facie* case, the plaintiff is required to provide evidence that he or she is at least as qualified as the successful candidate. *Id.* at 468–470, 628 N.W.2d at 523–25. The Court then went on to discuss what is required of a plaintiff with respect to the fourth *prima facie* element and specifically rejected the notion that it is sufficient for an Elliott–Larsen plaintiff to satisfy the fourth element merely by showing that the job for which plaintiff

---

**12.** To prove a violation of the Equal Protection Clause under § 1983, a plaintiff must prove the same elements as are required to establish a disparate treatment claim under the *McDonnell Douglas/Burdine* paradigm. *See Lautermilch v. Findlay City Schools, supra,* 314 F.3d 271; *Gutzwiller v. Fenik,* 860 F.2d 1317, 1325 (6th Cir.1988).

**13.** The Court notes that while Plaintiff has affirmatively stated that "the adverse action

suffered by Mr. Diop is [Defendants'] refusal to schedule Plaintiff for an interview with the Selection Committee," *see* Plaintiff's Brief, p. 16, he uses Defendants' *failure to hire him* for the full-time chemistry position as the "adverse action" upon which he predicates his *prima facie* case. *See* Plaintiff's Brief, p. 15. Therefore, the Court will address the *prima facie* requirements in the context of both purported "adverse actions."

had applied was awarded to a non-minority candidate. The Court stated:

> By this holding [that a plaintiff is not required to provide evidence that he is at least as qualified as the successful candidate], we do not mean to suggest that a plaintiff can establish the third and fourth elements of a *McDonnell Douglas* prima facie case merely by showing that he was qualified for the position and that a nonminority candidate was chosen instead. While a plaintiff is not required to show circumstances giving rise to an inference of discrimination in any one specific manner, the plaintiff's burden of production remains to present evidence that the employer's actions, "if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Burdine, supra* at 253, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207. In short, a plaintiff must offer evidence showing something more than an isolated decision to reject a minority candidate. See *Teamsters v. United States,* 431 U.S. 324, 358 n. 44, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). *As a matter of law, an inference of unlawful discrimination does not arise merely because an employer has chosen between two qualified candidates.* Under such a scenario, an equally—if not more—reasonable inference would be that the employer simply selected the candidate that it believed to be most qualified for the position. See *id.*

464 Mich. at 470–71, 628 N.W.2d at 525 (emphasis added).

After examining the record in *Hazle,* however, the Court was ultimately satisfied that the plaintiff had presented sufficient evidence from which a jury, if unaware of the defendant's reasons for selecting the non-minority candidate, could infer unlawful discrimination and,

therefore, the Court determined that she had satisfied the fourth and final element of a *prima facie* case. *Id.* Specifically, the Court was satisfied by the evidence which established "that (1) only plaintiff had a college degree and credits toward a master's degree in industrial relations, and (2) only plaintiff had substantial work experience with defendants." *Id.* at 472, 628 N.W.2d at 525. Therefore, the Court concluded that the burden then shifted to defendants to articulate a legitimate, nondiscriminatory reason for their decision to hire the non-minority candidate. *Id.*

 Plaintiff in this case similarly attempts to satisfy the fourth *McDonnell Douglas* element by arguing that he was better qualified than Joann Wittbrodt, who was selected for the full-time chemistry position because he had 17 years more teaching experience than Dr. Wittbrodt[14] and more seniority at WCCCD than she did. However, the record also shows that Dr. Wittbrodt holds a Ph.D. degree while Plaintiff holds only a masters, and Dr. Wittbrodt has also authored a number of articles, done many professional presentations, and won a number of awards for her work. *See* Defendant's Ex. 15. Thus, unlike the plaintiff in *Hazle* who clearly showed that she was better qualified for the position than the successful non-minority applicant, plaintiff has not shown that the WCCCD position was given to Dr. Wittbrodt "under circumstances giving rise to an inference of unlawful discrimination." Therefore, he has not made out a *prima facie* case of discrimination under Michigan law with respect to WCCCD's "failure to hire" him for the full-time chemistry position.

 As indicated above, Plaintiff also states that the College's "failure to sched-

---

**14.** Plaintiff had 25 years teaching experience while Dr. Wittbrodt had only 8 years.

ule him for an interview" is the "adverse employment action" that he is challenging as discriminatory. [Plaintiff's Brief, p. 16.] Although Plaintiff has not specifically discussed the *McDonnell Douglas* elements in the context of the College's failure to schedule him for an interview, the Court has reviewed the evidence of record, and similarly finds insufficient evidence from which a jury, if unaware of Defendants' reasons, could infer unlawful discrimination.

According to the sworn deposition testimony of Defendant Janet Dettloff, the Selection Committee identified 15 applicants to be interviewed. However, only seven applicants were interviewed. Five of these interviewees were white males,[15] and two were females, one of whom is white.[16] *Id.* at p. 66. Plaintiff's position appears to be that, in light of the race/sex of the applicants who were interviewed, because he is African–American and was not scheduled for an interview, sufficient evidence exists to give rise to an inference of discrimination. However, Plaintiff conspicuously overlooks the fact that he was one of eight applicants who were not scheduled for an interview. The seven other applicants not scheduled for interviews were white. Under these circumstances, Plaintiff cannot show that he was treated differently than similarly-situated non-minority applicants. Furthermore, Mark Sanford, who was responsible for scheduling the interviews, is himself an African–American. In light of the foregoing, the Court finds insufficient evidence of record giving rise to an inference of discrimination in the scheduling of interviews for the full-time chemistry position. Accordingly, the Court concludes that Plaintiff has not established a *prima*

*facie* case with respect to his "failure to schedule an interview" claim.

■ However, even assuming *arguendo* that Plaintiff has made out a *prima facie* case, WCCCD has rebutted any inference of discrimination by articulating a legitimate, nondiscriminatory reason for its decision. *Hazle, supra; Lytle, supra; McDonnell Douglas, supra; Burdine, supra.* According to the uncontradicted testimony of WCCCD Human Resources Manager Mark Sanford, the reason that Plaintiff was not scheduled for an interview was that the Selection Committee had reserved only two days for interviews, and when Sanford reached Plaintiff by phone to inform him that the Committee wanted to interview him for the full-time chemistry position, Plaintiff told him that he was not available on those dates. [*See* Sanford Dep., Defendants' Ex. 5, pp. 31–40.]

Because Defendants have articulated a non-discriminatory reason for not scheduling Plaintiff for an interview, the burden of production shifts back to the plaintiff to show by a preponderance of the evidence that the legitimate reason offered by the Defendants was not their true reason, but rather was a pretext for unlawful discrimination. *Hazle, supra* at 465–66, 628 N.W.2d 515; *Town, supra,* at 698, 568 N.W.2d 64; *Lytle, supra,* at 175–76, 579 N.W.2d 906. *Burdine, supra,* 450 U.S. at 253, 101 S.Ct. 1089. Plaintiff has not met this burden.

■ In *Lytle v. Malady, supra,* The Michigan Supreme Court affirmed its adoption of what it termed the "intermediate" position in determining whether a plaintiff's showing of pretext is sufficient

---

**15.** Three of the male interviewees were of Arabic nationality.

**16.** Dr. Dettloff testified that two of the interviewees were females—Dr. Joanne Wittbrodt and Ms. Crystal Gilbert. There is no evidence of record as to the race of Ms. Gilbert.

to survive a motion for summary judgment:

> Under this [intermediate] position, disproof of an employer's articulated reason for an adverse employment decision defeats summary disposition only if such disproof also raises a triable issue that discriminatory animus was a motivating factor underlying the employer's adverse action. In other words, plaintiff must not merely raise a triable issue that the employer's proffered reason was pretextual, but that it was a pretext for ... discrimination. Therefore, we find that, in the context of summary disposition, a plaintiff must prove discrimination with admissible evidence, either direct or circumstantial, sufficient to permit a reasonable trier of fact to conclude that discrimination was a motivating factor for the adverse action taken by the employer toward the plaintiff.

*Lytle,* 579 N.W.2d at 916 (footnotes omitted); *see also Town v. Michigan Bell Telephone Co.,* 455 Mich. 688, 568 N.W.2d 64, 68–69 (1997).[17]

All Plaintiff here has proffered is his subjective opinion that race was a motivating factor in the failure to schedule him for an interview. Plaintiff does not dispute that he told Mark Sanford that he was unavailable on the dates Sanford offered him to interview. [*See* Plaintiff's Brief, p. 18.] Nonetheless, he contends that because Sanford never told him that his failure to make himself available for an interview on those dates would cost him the opportunity to interview for the position, coupled with the fact that WCCCD had his application for five months before calling him for an interview, Defendants' articulated reason must be false. However, it is well-settled that the plaintiff's denial of the

defendant's articulated legitimate reason without producing substantiation for the denial is insufficient for a race discrimination claim to withstand a motion for summary judgment. *See e.g., Irvin v. Airco Carbide,* 837 F.2d 724 (6th Cir.1987); *Ridenour v. Lawson Co.,* 791 F.2d 52 (6th Cir.1986).

Plaintiff also relies upon the affidavits of two of his co-workers, William Anderson and William Mott [discussed *supra*] who opined that Defendant Dettloff is a racist and that they believe race is a factor in every hiring decision at the College. However, conclusory allegations and subjective beliefs are insufficient evidence to establish a claim of discrimination as a matter of law. *O'Shea v. The Detroit News,* 887 F.2d 683 (6th Cir.1989); *Simpson v. Midland–Ross Corp.,* 823 F.2d 937 (6th Cir. 1987); *Sisson v. Board of Regents,* 174 Mich.App. 742, 436 N.W.2d 747 (1989), *lv. den.,* 434 Mich. 895 (1990). Furthermore, as noted above, Dr. Dettloff had nothing to do with the ministerial task of scheduling interviews for the full-time chemistry position. The person responsible for scheduling the interviews was Mark Sanford, who, like Plaintiff, is an African–American. Indeed, Dr. Dettloff was not even the decision-maker or the primary decision-maker with respect to the ultimate hiring decision; she was only one member of a five-person committee—which consisted of three African–Americans and two whites—that recommended two candidates to the College Chancellor, Dr. Ivery—himself an African–American—and Dr. Ivery made the ultimate decision to hire Dr. Wittbrodt. Therefore, even accepting Messrs. Mott's and Anderson's subjective opinions that Dr. Dettloff is a racist, because she was not the decision-maker with respect to ei-

---

**17.** Michigan law differs from federal law in this respect. Under federal law, there is no "pretext plus" requirement. *See Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 147–148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Peters v. Lincoln Elec. Co.,* 285 F.3d 456 (6th Cir.2002).

ther the failure to schedule Plaintiff for an interview or the ultimate hiring of Dr. Wittbrodt, the Court finds that Plaintiff has failed to rebut Defendants' proffered non-discriminatory reason for not scheduling him for an interview for the full-time chemistry position. Therefore, Defendants' motion for summary judgment on Plaintiff's Elliott–Larsen Civil Rights Act claim and on his Fourteenth Amendment Equal Protection claim [18] will be granted.[19]

## D. *PLAINTIFF'S SECTION 1983 CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS MUST BE DISMISSED.*

Plaintiff has also alleged Section 1983 claims for violation of his procedural and substantive due process rights against all of the Defendants.

42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory of the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

However, a state official sued in his *official* capacity is not a "person"

within the meaning of § 1983. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 64, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *Whittington v. Milby*, 928 F.2d 188, 193 (6th Cir.1991). A suit against a public official in his official capacity is deemed to be a suit against the governmental entity, *not* a suit against the official, personally. *Kentucky v. Graham*, 473 U.S. 159, 165–66, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985). *See also, Will v. Michigan Dep't of State Police, supra,* 491 U.S. at 71, 109 S.Ct. 2304 ("a suit against a state official in his or her official capacity is not a suit against the official but rather a suit against the officials office," and "[a]s such, it is not different than a suit against the State itself." *Id.*)

In *Will v. Michigan Dept. of State Police, supra,* the Supreme Court held that the Eleventh Amendment bars § 1983 suits against a state and against state employees sued in their official capacities, unless the state has waived its immunity, or unless Congress has overridden the state's immunity under section 5 of the Fourteenth Amendment. 491 U.S. at 66, 109 S.Ct. 2304. As a result, § 1983 plaintiffs are required to "set forth clearly in their pleading that they are suing the state defendants in their individual capacity for damages, not simply their capacity as state officials." *Shepherd v. Wellman*, 313 F.3d 963, 967 (6th Cir.2002) (quoting

---

**18.** As noted above, to prove a violation of the Equal Protection Clause under § 1983, a plaintiff must prove the same elements as are required to establish a disparate treatment claim under the *McDonnell Douglas/Burdine* paradigm. *See Lautermilch v. Findlay City Schools, supra; Gutzwiller v. Fenik, supra.*

**19.** The Court notes that even if it were to find the Plaintiff had made out a *prima facie* claim of discrimination under a failure to promote theory, it would similarly find that the Defendants were entitled to summary judgment. Dr. Dettloff testified that Dr. Joanne Witt-

brodt was hired for the full-time chemistry position because she was far and away the best qualified applicant. [*See* Dettloff Dep. p 104.] Plaintiff disputes this, but as indicated, the plaintiff's denial of the defendant's articulated legitimate reason is insufficient to withstand a motion for summary judgment, *Irvin, supra; Ridenour, supra,* and Plaintiff's other proffered evidence, i.e., the opinions of Messrs. Anderson and Mott, are insufficient to establish a claim of discrimination as a matter of law. *O'Shea, supra; Simpson, supra; Sisson, supra.*

*Wells v. Brown,* 891 F.2d 591, 593 (6th Cir.1989)).

 Plaintiff in this case has not designated in the caption of his Complaint the capacity in which he is suing the Defendants in this case. The Sixth Circuit recently reaffirmed the requirement first enunciated in *Wells v. Brown,* that "§ 1983 plaintiffs must clearly notify any defendants of their intent to seek individual liability." *See Moore v. City of Harriman,* 272 F.3d 769, 775 (6th Cir.2001) (*en banc*), *cert. denied,* —— U.S. ——, 122 S.Ct. 2586, 153 L.Ed.2d 776 (2002). Absent a clear notification that defendants are being sued in their individual capacities, courts must assume that they are being sued in their official capacities, only. *See Whittington v. Milby, supra; Wells v. Brown, supra.*

In the *Moore* case, the Court held that "reviewing the course of proceedings is the most appropriate way to determine whether such notice has been given and received." 272 F.3d at 775. This includes reviewing the allegations in the plaintiff's complaint as well as allegations made by him in subsequent filings. *Id.* at 773–74. Based upon such a course of proceeding review, the *Moore* court concluded that plaintiff in that case had sufficiently pled an individual capacity action. The *en banc* court explained:

> . . . The caption on Moore's complaint lists only the officers' names not their official titles. The complaint refers to the officers throughout as the "individual defendants." Paragraph Eleven of the complaint states, "The said officers action *for themselves and* for the City," behaved "with malice . . . and violated the plaintiff's civil rights." Finally, Moore sought compensatory and punitive damages against "each of the defendants." Taken as a whole, the complaint likely provided sufficient notice to the officers that they were being sued as individuals.

Even assuming the complaint itself failed to provide sufficient notice, Moore's response to the officers' motion to dismiss clarified any remaining ambiguity: "The individuals named are police officers who are being sued in their individual capacities for using excessive and unreasonable force while making an arrest of the Plaintiff on April 7, 1996." *Id.* at 773–74 (emphasis in original).

By contrast, in *Shepherd v. Wellman,* 313 F.3d 963 (6th Cir.2002) the Court or Appeals found insufficient indication in the plaintiffs' pleadings that the individual defendant was being sued in his individual capacity. The *Shepherd* court explained:

> We begin with the complaint itself. We cannot say that either the original complaint or the first amended complaint placed Wellman on notice that he was being sued as an individual. If anything, the complaint suggests that Wellman was being sued in his official capacity. The amended complaint alleges that "Defendant Commissioner Billy Wellman at the time of the shooting of Gary Shepherd had overall charge of and supervisorial [sic] responsibility over the Kentucky State Police and was responsible for the training and supervision of officers in it." The complaint goes on to allege that the "murder" of Gary Shepherd "was clearly committed under color of state law." In the complaint, the plaintiffs also allege that Wellman "had supervisorial [sic] responsibility" over the KSP Special Response Team and was "charged with legal responsibility for the adequacy or inadequacy of its training and supervision."
>
> Indeed, the plaintiffs' request for monetary damages is the only indication that they might be suing Wellman in his individual capacity. Although *Moore* recognizes that the request for monetary damages is one factor that might

place an individual on notice that he is being sued in his individual capacity, we do not read that case as holding that a request for money damages is alone sufficient to place a state official on notice that he is being sued in his individual capacity. To so hold would be inappropriate, because the rest of the complaint so strongly suggests an official capacity suit. Furthermore, unlike in *Moore*, there were no subsequent pleadings in this case that put the defendant on notice that he was being sued as an individual.

For these reasons, we conclude that the district court's dismissal of the § 1983 action against Wellman was proper.

*Id.* at 968–69.

Reviewing the course of proceedings in the instant action, the Court finds that no clear indication has been given that Defendants here are being sued in their individual capacities. First, as indicated, Plaintiff did not designate in the caption of his Complaint the capacity in which he was suing any of the Defendants. Further, there is no indication in the text of the Complaint that Plaintiff is suing Defendants Hayden, Lewis, Stempfle, Paddock, Ford, Wahls, Jr., Wellons–Glover, Clemente, Reddy, Ivery or Dettloff in their individual capacities. Indeed, the plain language of Plaintiffs' Complaint indicates that Plaintiff is suing these Defendants for actions taken in their official capacities as members of the WCCCD Board of Trustees or Administrators of the College. In pertinent part, Plaintiff's Complaint states as follows:

6. Defendant Wayne County Board of Trustees ("the Board") is the governing body of WCCCD.

7. Frank Heyden, Larry K. Lewis, Mary Ellen Stempfle, Charles Paddock, Juanita Ford, Myron Wahls, Jr., Denise Wellons–Glover, Edward D. Clemente and Michael Reddy are the individual duly elected members of the Board....

8. Dr. Curtis L. Ivery is the President of WCCCD.

9. Defendant Janet Dettloff ("Dettloff"), upon information and belief, is the Assistant Dean of Instruction and Chairperson for the Department of Life and Physical Sciences of WCCCD.

\* \* \* \* \* \*

46. When the events alleged in this complaint occurred, Defendant Dettloff was *acting within the scope of her employment and under color of law.*

47. At all material times, Defendants WCCCD, the President and the Board employed Dettloff and are *liable for her acts under the doctrine of respondeat superior....*

\* \* \* \* \* \*

49. Defendants employees, *acting under color of state law,* failed and refused to promote Plaintiff to the position of full-time chemistry instructor....

\* \* \* \* \* \*

52. Defendants WCCCD, the Board of Trustees, and Ivery, *acting under color of state law,* authorized, tolerated, ratified, permitted, or acquiesced in the creation of policies, practices, and customs, establishing a de facto policy of deliberate indifference to individuals such as Plaintiff Diop.

[Complaint ¶¶ 6–9; 46–47; 49; 52 (emphasis added).]

Unlike *Moore*, in the Complaint in the instant action, Plaintiff never refers to Defendants as the *"individual* defendants," nor is there any allegation that the individual Defendants were acting for themselves or that Plaintiff seeks to recover damages

for violation of his civil rights from each of them. Rather, the Complaint here is more like the complaint in *Shepherd*. Furthermore, with respect to his claim for damages for violation of his civil rights, Plaintiff merely requests the Court enter a monetary judgment "against *Defendant* [singular]," *see* Complaint, ¶ 54. When read together with Plaintiff's allegations that the Defendants acted under color of state law, that WCCCD, the Board of Trustees and Chancellor Ivery established a de facto college policy of deliberate indifference and that they are liable under the doctrine of respondeat superior for the actions of College employees, Plaintiff's prayer for damages against *Defendant* [singular] suggests that Plaintiff himself views the individual Defendants as acting on behalf of the College and that only the College as liable to him for damages.

Furthermore, Plaintiff's subsequent pleadings do not rectify the deficiencies in his Complaint. There is no assertion by Plaintiff in his brief in response to Defendants' motion for summary judgment similar to those of the plaintiff in *Moore*, who stated in his response to the defendants' motion to dismiss in that case that "the individuals named are police officers who are being sued in their individual capacities."

In sum, based upon a review of the course of proceedings in this case as directed by the *Moore* and *Shepherd* decisions, the Court finds that Defendants were not given clear notification that they were being sued in their individual capacities. Rather, the only clear notification was that they were being sued in their official capacities. Therefore, to the extent that Plaintiff has alleged Section 1983 due process claims against the individual Defendants those claims will be dismissed.

**E. *EVEN ASSUMING ARGUENDO THAT PLAINTIFF HAS SUFFICIENTLY PLED HIS SECTION 1983 CLAIMS AGAINST ALL OF THE DEFENDANTS, DEFENDANTS ARE NONETHELESS ENTITLED TO SUMMARY JUDGMENT ON THOSE CLAIMS***

**1. *Plaintiff's Substantive Due Process Claim is Defective***

 In addition to claiming that Defendants' failure to interview and promote him to the full-time position amounted to discrimination, Plaintiff also alleges that Defendants "trampled [his] rights under the CBA [collective bargaining agreement] to apply for the position and to his priority over every other applicant for the position, as the most senior part-time instructor in the chemistry department" in violation of Plaintiff's Fourteenth Amendment substantive due process rights. [*See* Plaintiff's Brief, p. 21.]

 The Fourteenth Amendment prohibits state actors from depriving an individual of life, liberty or property without due process of law. *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 538 n. 3, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); *Lautermilch v. Findlay City Schools*, 314 F.3d 271, 274 (6th Cir.2003); *Charles v. Baesler*, 910 F.2d 1349, 1352 (6th Cir.1990). In order to establish a due process violation, the plaintiff must first establish the existence of a constitutionally protected property or liberty interest. *Silver v. Franklin Twp. Bd. of Zoning Appeals*, 966 F.2d 1031, 1036 (6th Cir. 1992). Plaintiff here does not claim a life or liberty interest in job promotion; rather it appears that his claim is predicated upon a "property interest" "Property interests are not created by the Constitution, but are created and defined by 'existing rules or understandings that stem from an independent source.'" *Sutton v. Cleveland*

*Bd. of Education,* 958 F.2d 1339, 1348 (6th Cir.1992) (quoting *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972)). Plaintiff here contends that his constitutionally protected "property interest" arises as a result of the collective bargaining agreement governing his employment at WCCCD.

■ To have a constitutionally cognizable property interest, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Having reviewed the supplied provisions of the CBA which governed Plaintiff's part-time employment at WCCCD, *see* Plaintiff's Ex. O, the Court finds no provision which would contractually entitle Plaintiff to the promotion to the full-time chemistry position.

Plaintiff relies upon the following provisions of the CBA:

II. NOTICE OF VACANCIES

. . .

B. Any employee of the College may apply for [a vacant] position by written application to the administrator designated in the notice. An application for a position shall be recognized as a professional right and shall not affect adversely an employee's status in his present position.

\* \* \* \* \* \*

III. SELECTION OF CANDIDATES

A. *The Employer shall give primary consideration to applicants from within the College* **if their qualifications are superior or equal to other qualified applicants, provided the priorities in Section C are adhered to.**

B. In order to fill a full-time vacancy, the appropriate Academic Administra-

tor and his full-time faculty and a representative from the Human Resources Department shall review all applications and interview and evaluate qualified applicants.

\* \* \* \* \* \*

IV. PRIORITIES FOR FILLING VACANCIES

The following priorities shall be observed in the filling of full-time faculty vacancies at the College:

\* \* \* \* \* \*

C. ***A part-time faculty member shall,*** after the above mentioned applicants [i.e., full-time faculty members and former full-time faculty members] ***be given primary consideration for a faculty appointment to a vacancy in a program, department or area.***

[Plaintiff's Ex. O]

Nothing in the above CBA provisions guarantee a part-time faculty member a full-time position. All that the CBA assures is that all College employees have a right *to apply* for any vacant positions within the College, and that a part-time faculty member whose qualifications are equal to or superior to those of other applicants shall be given "primary consideration" for an open full-time position. Thus, it is clear that Plaintiff cannot demonstrate that, by virtue of the CBA, he has a "legitimate claim of entitlement" to a promotion to a full-time position in the chemistry department.

However, even assuming *arguendo* that under the CBA Plaintiff would have been entitled to the promotion so as to create a "property right," as Justice Powell observed in his concurring opinion in *Regents of University of Michigan v. Ewing,* 474 U.S. 214, 229, 106 S.Ct. 507, 515, 88 L.Ed.2d 523 (1985), "Even if one assumes the existence of a property right . . . not

every such right is entitled to the protection of substantive due process." *Id.* at 577, 92 S.Ct. at 2709.

 In *Charles v. Baesler, supra,* the Sixth Circuit addressed the scope of substantive due process when answering the question whether a public employee could assert a substantive due process right to a promotion based upon an employment contract. The court answered that question in the negative and explained:

We conclude that no such right exists. Most, if not all, state-created contract rights... are not protected by substantive due process. The substantive Due Process Clause is not concerned with the garden variety issues of common law contract. Its concerns are far narrower, but at the same time, far more important. Substantive due process "affords only those protections 'so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" It protects those interests, some yet to be enumerated, "implicit in the concept of ordered liberty," like personal choice in matters of marriage and the family.

State-created rights such as [plaintiff's] contractual right to promotion do not rise to the level of [a] "fundamental" interest protected by substantive due process. Routine state-created contractual rights are not... vital that "neither liberty nor justice would exist if [they] were sacrificed."

910 F.2d at 1352 (citations omitted). *See also, Thomson v. Scheid,* 977 F.2d 1017, 1020 (6th Cir.1992) ("[T]he right to a promotion is not a fundamental interest protected by substantive due process.") *Accord, Sutton v. Cleveland Bd. of Education,* 958 F.2d 1339, 1351 (6th Cir.1992) (holding that the right to be discharged only for cause is not a fundamental interest protected by substantive due process.)

The foregoing controlling authorities make clear that Plaintiff's substantive due process claim in this case is without legal merit.

2. *Plaintiff's Procedural Due Process Claim Is Similarly Without Merit*

The requirements of procedural due process (i.e., "notice and an opportunity to respond", *see Cleveland Bd. of Education v. Loudermill,* 470 U.S. 532, 546, 105 S.Ct. 1487, 1495, 84 L.Ed.2d 494 (1985)) apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 569–70, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). As discussed above, Plaintiff has failed to demonstrate that he has a constitutionally protected property interest. Therefore, his procedural due process claim, fails as a matter of law.

 However, even if Plaintiff were to have demonstrated a legally cognizable constitutionally protected property interest, in *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), the Supreme Court held that in order to state a procedural due process claim under Section 1983, the plaintiff must show that available state procedures were inadequate to compensate for the deprivation of the protected property interest. It is well-settled that a claim of lack of due process fails on the merits where there is a process available under state law. *Limerick v. Greenwald,* 749 F.2d 97, 99 (1st Cir.1984). Thus, where a plaintiff fails to avail himself of contractual grievance procedures or other available state remedies (such as an administrative employee relations commission action or a state court action), he may not bring a federal claim of lack of due process. *See McMenemy v. City of Rochester,* 241 F.3d 279, 288–89 (2nd Cir.2001); *Boston Environmental Sanitation Inspec-*

*tors Ass'n v. City of Boston,* 794 F.2d 12, 13 (1st Cir.1986). As the court stated in *Roslindale Cooperative Bank v. Greenwald,* 638 F.2d 258 (1st Cir.), *cert. denied,* 454 U.S. 831, 102 S.Ct. 128, 70 L.Ed.2d 108 (1981),

> We cannot be sympathetic to a party who elects to forego the [state procedures] provided him, and then complains he received none .... Since a sufficiently timely hearing was available to them, [plaintiffs] cannot bootstrap themselves into the federal court by failing to seek it.

*Id.* at 261.

In this case, the CBA governing Plaintiff's employment afforded him a right to file a grievance to contest his failure to get the full-time chemistry position. *See generally,* excerpts from the CBA attached to Defendants' Brief as Ex. 3. Plaintiff also could have filed a judicial breach of contract action or proceeded with an administrative complaint before the Michigan Employee Relations Commission. However, Plaintiff did not avail himself of any of these remedies. Furthermore, Plaintiff has not alleged any facts to suggest that these remedies might be constitutionally inadequate. Therefore, he cannot complain here that he was denied procedural due process. Accordingly, his procedural due process claim will be dismissed.

**F. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S QUI TAM CLAIM**

Under the False Claims Act (the "FCA"), a private individual (a "relator") may bring an action (referred to as a *"qui tam* action") on behalf of the United States against any individual or company who has knowingly presented a false or fraudulent claim to the United States government. In particular, the FCA imposes liability on one who "knowingly presents" to the United States government "a false or fraudu-lent claim for payment." 31 U.S.C. §§ 3729(a); 3730(b)(1).

To establish a *prima facie* case under the FCA, a plaintiff must prove that (1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent. *See Hutchins v. Wilentz,* 253 F.3d 176 (3rd Cir.2001); 31 U.S.C. § 3729. A false certification of compliance creates liability under the FCA when certification is a pre-requisite to obtaining a government benefit. *See United States ex rel. Hopper v. Anton,* 91 F.3d 1261, 1266 (9th Cir.1996).

Plaintiff here claims that the Defendants have falsely certified WCCCD's compliance with the provisions of the Federal Student Financial Assistance ("FSFA") program. The only certification made by WCCCD is found at the end of the "Application for Approval to Participate in the Federal Student Financial Aid," where Dr. Curtis Ivery, the College Chancellor, certified,

> I hereby certify that, to the best of my knowledge and belief, all information in this document is true and correct....

[Defendants' Ex. 12.]

Plaintiff's theory is that the accreditation information contained in the College's FSFA application is false. His theory is that the College could not be properly accredited because the chemistry labs do not have adequate materials and are ill-equipped.

Section B of the FSFA Application asks the applicant as follows:

> Section B. Please tell us about your accreditation and state authorization to provide postsecondary education.
>
> \* \* \* \* \* \*
>
> 15. What is your accrediting agency?

If you have institution-wide accreditation, which accrediting agency provides this accreditation?

If more than one accrediting agency provides accreditation, designate the one you wish us to use in determining your eligibility and continued eligibility.

If you do not have institutional wide accreditation, provide the following information for each accrediting agency that either accredits a program that is currently eligible or for which you are seeking eligibility. (This includes programs such as a hospital-based nursing program or radiologic technology program.)

You must include a copy of your accreditation.

[*See* Defendants' Ex. 12.]

In response, WCCCD indicated that it is accredited by the North Central Association of Colleges and Schools–CIHE, that it was last accredited in 1999, that that accreditation is for 10 years, and that its accreditation is "institution-wide." *Id.* Plaintiff does not dispute that any of this information is false or misleading. Rather, he appears to challenge the validity of North Central's accreditation seeming to suggest that the accreditation is flawed, and WCCCD knew that it was flawed because its chemistry labs are under equipped.

Plaintiff attempts to engraft onto the FSFA certification the "program participation agreement" requirements in 20 U.S.C. § 1094 which require for an institution to participate in the Federal Student Financial Aid program that the institution meet the requirements established by a recognized accrediting agency.[20] In particular, Plaintiff relies upon the following provision of the statute:

20. North Central Association, which accredited WCCCD, is one such recognized accredit-

### § 1094. Program participation agreements

**(a) Required for programs of assistance; contents**

In order to be an eligible institution for the purposes of any program authorized under this subchapter [20 U.S.C.A. § 1070 et seq.]..., an institution must be an institution of higher education... and shall... enter into a program participation agreement with the Secretary. The agreement shall condition the initial and continuing eligibility of an institution to participate in a program upon compliance with the following requirements:

&ast; &ast; &ast; &ast; &ast; &ast;

(21) The institution will meet the requirements established by the Secretary and accrediting agencies or associations, and will provide evidence to the Secretary that the institution has authority to operate within a State.

20 U.S.C. § 1094(a)(21).

The "requirements established by the Secretary and accrediting agencies" are set forth in 20 U.S.C. § 1099b. In pertinent part, Section 1099b provides as follows:

### § 1099b. Recognition of accrediting agency or association

**(a) Criteria required**

No accrediting agency or association may be determined by the Secretary to be a reliable authority as to the quality of education or training offered for the purposes of this chapter or for other Federal purposes, unless the agency or association meets criteria established by the Secretary pursuant to this sec-

ing agency. *See* 65 Fed.Reg. 53277.

tion.... Such criteria shall require that—

* * * * * *

(4) such agency or association consistently applies and enforces standards that ensure that the courses or programs of higher instruction, training, or study offered by the institution of higher education ... are of sufficient quality to achieve, for the duration of the accreditation period, the stated objective for which the courses or the programs are offered;

(5) the standards for accreditation of the agency or association assess the institution's—

(A) success with respect to student achievement in relation to the institution's mission, including, as appropriate, consideration of course completion, State licensing examinations, and job placement rates;

(B) curricula;

(C) faculty;

(D) facilities, equipment, and supplies;

(E) fiscal and administrative capacity as appropriate to the specified scale of operations;

(F) student support services;

(G) recruiting and admissions practices, academic calendars, catalogs, publications, grading and advertising;

(H) measures of program length and the objectives of the degrees or credentials offered; ·

(I) record of student complaints received by, or available to the agency or association; and

(J) record of compliance with its program responsibilities under this subchapter [20 U.S.C.A. § 1070 et seq.] and part C of subchapter I of chapter 34 of Title 42 [42 U.S.C.A. § 2751 et seq.] based on the most recent student loan default rate data provided by the Secretary, the results of financial or compliance audits, program reviews, and any such other information as the Secretary may provide to the agency or association....

20 U.S.C. § 1099b(a)(4),(5).

As indicated, Section 1099b prescribes the responsibilities of accrediting agencies (like the North Central Association) to consistently apply standards that insure the quality of instruction offered by institutions of higher education. The statute also imposes sanctions on accrediting agencies which fail to effectively apply the criteria listed in the statute. *See* 20 U.S.C. § 1099b(*l*).[21] However, nothing in Section 1099b imposes any duties on WCCCD or any other institution of higher education. Accordingly, Plaintiff's reliance on this section to define the nature and extent of WCCCD's FSFA certification is wholly misplaced.

Rather, it is clear that the legislative and regulatory scheme of the FSFA con-

---

**21.** Section 1099b(*l*) provides as follows:

(1) If the Secretary determines that an accrediting agency or association has failed to apply effectively the criteria in this section or is otherwise not in compliance with the requirements of this section, the Secretary shall—

(A) after notice and opportunity for a hearing, limit, suspend, or terminate the recognition of the agency or association; or

(B) require the agency or association to take appropriate action to bring the agency or association into compliance with such requirements within a timeframe specified by the Secretary except that—

(i) such timeframe. shall not exceed 12 months unless the Secretary extends such period for good cause; and

(ii) if the agency or association fails to bring the agency or association into compliance within such timeframe, the Secretary shall, after notice and opportunity for a hearing, limit, suspend or terminate the recognition of the agency.

templates delegating the task of insuring the education viability of institutions of higher education to private accreditation agencies. Indeed, the very FSFA section relied upon by Plaintiff provides that the initial and continuing eligibility of an institution of higher education in the FSFA program is conditioned upon the institution "meet[ing] the requirements *established by the Secretary and accrediting agencies and associations.*" *See* 20 U.S.C. § 1094(21). Nothing in the accreditation agency statutes requires the College or Chancellor Ivery to have ascertained whether North Central considered the adequacy of the chemistry labs in granting accreditation.

Moreover, Plaintiff had an opportunity to make North Central aware of his concerns about the inadequacy of the chemistry labs when the continued accreditation of WCCCD was considered by North Central in 1999. As part of the accreditation process, on November 8–10, 1999, a ten-member evaluation team comprised of executives, teaching faculty and representatives from other community colleges from across the country visited WCCCD to review educational and operational aspects of the College. Team members visited all of the College's facilities, sat in on classes, and reviewed course curricula. The visit of the accreditation team was announced to all members of the college community, including faculty, staff, students, and the public at-large. Written communications were posted throughout the College buildings, and ads were placed in newspapers of general circulation to notify the public that the accreditation team would convene public meetings to allow any individual so desiring to convey pertinent information to the team. According to the Affidavit of Joann Pieronek, the Vice–Chancellor of Educational Affairs, many WCCCD faculty and staff members attended such meetings and no restrictions were placed on the information that was imparted to accredi-

tation team members. [*See* Defendants' Ex. 8.] Thus, if Plaintiff were truly concerned about the condition of the chemistry labs and their impact on the education that students were receiving at WCCCD, he could have brought his concerns directly to the accreditation team while the continued accreditation of the College was under review. Following the visit, the accreditation team issued a report of its visit and granted WCCCD institution-wide accreditation for a ten-year period ending in 2009.

Furthermore, Plaintiff has presented this Court with no specific evidence of what equipment and chemicals the chemistry labs had, and what they were lacking, nor has he presented any evidence as to the standards by which chemistry labs are to be measured for accreditation purposes. Effectively, all that Plaintiff has presented are his vague, conclusory allegations, with no specificity whatsoever, that there sometimes were insufficient chemicals or chemicals that were too old to do the experiments called for in the chemistry textbooks, and that, as a result, students were not being provided a satisfactory education. For Plaintiff to ask the Court to find that the education offered to students at WCCCD institution-wide is inadequate under these circumstances would place the Court in the position of usurping the statutory role of the accrediting agency in assessing the quality of education offered by an institution for purposes of the Federal Student Financial Assistance programs.

For all of these reasons, the Court finds that Plaintiff has failed to show that WCCCD or Chancellor Ivery falsely certified the truthfulness of the information in its FSFA application. Therefore, the Court will grant Defendants' motion for summary judgment on Plaintiff's *qui tam* claim.

G. *DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S FCA RETALIATION CLAIM ON THE BASIS OF SOVEREIGN IMMUNITY UNDER THE ELEVENTH AMENDMENT*

■ In Count II of his Complaint, Plaintiff alleges that Defendants' decision not to hire him for the full-time chemistry position was done in retaliation following his efforts to notify Defendant Dettloff that the deficiencies in the chemistry labs amounted to academic fraud in violation of the anti-retaliation provision of the False Claims Act, 31 U.S.C. § 3730(h). Defendants argue that they are immune from liability on this claim on the basis of sovereign immunity under the Supremacy Clause of the Eleventh Amendment.

■ The Eleventh Amendment of the United States Constitution provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." Although by its terms the Amendment applies only to suits against a State by citizens of another State, the United States Supreme Court has extended the Amendment's applicability to suits by citizens against their own States. *See Kimel v. Florida Bd. of Regents,* 528 U.S. 62, 72–73, 120 S.Ct. 631, 145 L.Ed.2d 522(2000); *College Savings Bank v. Florida Prepaid Postsecondary Ed. Expense Bd.,* 527 U.S. 666, 669–670, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999); *Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 54, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court, except when Congress has abrogated that immunity for a particular cause of action. *Edelman v. Jordan,* 415 U.S. 651, 662, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974);*Board of Trustees of University of Alabama v. Garrett,* 531 U.S. 356, 363, 121 S.Ct. 955, 961–62, 148 L.Ed.2d 866 (2001). While Congress may abrogate Eleventh Amendment immunity and provide for private suits against States or state officials, it must use unequivocal statutory language to do so. *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 105 S.Ct. 3142, 87 L.Ed.2d 171, (1985). The anti-retaliation provision of the False Claims Act, 31 U.S.C. § 3730, does not abrogate Eleventh Amendment immunity as the statutory language is silent on this issue. *United States. ex rel. Moore v. University of Michigan,* 860 F.Supp. 400, 403 (E.D.Mich.1994).

■ A state agency may invoke the state's Eleventh Amendment immunity if it will protect the state treasury from liability that would have essentially the same practical consequences as a judgment against the state itself. *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 123, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). By contrast, Eleventh Amendment immunity does not extend to independent political subdivisions such as counties or cities. *Lincoln County v. Luning,* 133 U.S. 529, 10 S.Ct. 363, 33 L.Ed. 766 (1890); *Mt. Healthy City Bd. of Educ. v. Doyle,* 429 U.S. 274, 280, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). The issue here is whether WCCCD should be treated as an arm of the state or as an agency of a municipal corporation or other political subdivision to which Eleventh Amendment immunity does not extend.

■ State universities and colleges almost always enjoy Eleventh Amendment immunity. *See, e.g., Raygor v. Regents of Univ. of Minnesota,* 534 U.S. 533, 122 S.Ct. 999, 152 L.Ed.2d 27 (2002); *Robinson v. Univ. of Akron School of Law,* 307 F.3d 409 (6th Cir.2002). However, community and technical colleges tend to pres-

ent more difficult questions because they are most often hybrids of state and local entities. In such cases, the court must examine the particular entity in question and its powers and characteristics as created by state law to determine whether suit is in reality against the State. Courts typically look at the degree of local autonomy and control and most importantly, whether the funds to pay any award will be derived from the State treasury. *See, e.g., Hadley v. North Arkansas Community Technical College,* 76 F.3d 1437, 1439 (8th Cir.1996), *cert. denied,* 519 U.S. 1148, 117 S.Ct. 1080, 137 L.Ed.2d 215 (1997).

Article 8, § 7 of the Michigan Constitution requires that the Legislature to provide by-laws for the establishment and financial support of public, community and junior colleges to be supervised by locally elected boards. Pursuant to this provision, the Michigan Legislature adopted the Community College Act of 1966, M.C.L. 389.1, *et seq.,* a more than 100 section Act which created a uniform system of laws to govern the activities of all community colleges in Michigan. The preamble to this Act demonstrates its broad scope:

> An act to revise and consolidate the laws relating to community colleges; to provide for the creation of community college districts; to provide a charter for such districts; to provide for the government, control and administration of such districts; to provide the election of the Board of Trustees; to define the powers and duties of the Board of Trustees; to provide for the assessment, levy, collection and return of taxes therefor; and to repeal certain acts and parts of acts.

Further, each year the Legislature appropriates funds for every community college in the State of Michigan. During the fiscal year ending June 30, 1999, 34.8% of WCCCD's revenues came from State of Michigan appropriations. [*See* Affidavit of Michael Dotson, WCCCD's Vice–Chancellor in charge of Finance, Defendants' Ex. 16.] During the fiscal year ending June 30, 2000, 33.9% of WCCCD's revenues came from State of Michigan appropriations. *Id.* And, During the fiscal year ending June 30, 2001, 34.5% of WCCCD's revenues came from the State. *Id.*

The Sixth Circuit has not addressed the specific question of whether a community college is entitled to invoke the State's sovereign immunity under the Eleventh Amendment. However, the Eight Circuit squarely addressed this issue in its detailed, and well-reasoned opinion in *Hadley v. North Arkansas Community Technical College, supra.* In *Hadley,* the court determined that the community college was both financially and institutionally an arm of the state and that any damage award would necessarily invade the state treasury. Even though the court conceded that community colleges in Arkansas had elements of local funding and control, and that by statute, local financial participation was mandatory, it determined that the plaintiff's claim was in reality a suit against the state because funds to pay any award would come from the state treasury. The plaintiff argued that the damages in the suit could be paid from other sources, such as future local taxes, tuition, federal grants or other discretionary funds, but the court rejected this argument and held that the community college was immune from suit in federal court.

In *Hadley,* the court found that the State funding constituted 75.1% of the community college's revenues. The State funding of WCCCD constitutes a smaller percentage of the College's revenues. Nonetheless, since State funding amounts to more than 1/3 of WCCCD's revenues, it is inescapable that any damage award would, by necessity, invade the state treasury, at least in part. Furthermore, WCCCD was created by the State and is

subject to the comprehensive State statutory scheme governing the operations of community colleges. Given the totality of these facts, the Court finds that WCCCD is an arm of the State, and therefore, enjoys Eleventh Amendment immunity.

## H. ASSUMING ARGUENDO THAT ELEVENTH AMENDMENT IMMUNITY DOES NOT APPLY HERE, PLAINTIFF HAS NOT MADE OUT A LEGALLY COGNIZABLE FCA RETALIATION CLAIM

■ The FCA protects "whistleblowers" who pursue or investigate or otherwise contribute to a *qui tam* action, exposing fraud against the United States government. 31 U.S.C. § 3730(h) provides, in pertinent part, as follows:

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms or conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or other in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section shall be entitled to all relief necessary to make the employee whole.

■ For a retaliation claim under 31 U.S.C. § 3730(h) to be successful, the plaintiff must show that: (1) he engaged in a protected activity; (2) the defendants were aware of this conduct; and (3) he was subjected to an adverse employment action. *McKenzie v. BellSouth Telecommunications, Inc.*, 219 F.3d 508, 514 (6th Cir. 2000); *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 951 (5th Cir.1994), *cert. denied*, 513 U.S. 1154, 115 S.Ct. 1110, 130 L.Ed.2d 1075 (1995). To have been engaged in a "protected activity," there must be some nexus with the "in furtherance of" prong an FCA action. *McKenzie,*

*supra*, 219 F.3d at 515; *U.S. ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 740 (D.C.Cir.1998). In other words, to constitute a "protected activity" for purposes of a retaliation claim, the plaintiff must show that his actions sufficiently furthered "an action filed or to be filed under" the FCA. *McKenzie, supra*, 219 F.3d at 516.

Thus, in *McKenzie,* the Sixth Circuit affirmed the district court's award of summary judgment in favor of the defendants on the plaintiff's FCA retaliation claim because the plaintiff could not show that she had taken action in furtherance of a *qui tam* action under the FCA. McKenzie claimed that she engaged in protected activity when she informed supervisors, union stewards and BellSouth auditors about the falsification of repair records. The Sixth Circuit disagreed, explaining:

> McKenzie has not taken action in furtherance of a *qui tam* action under the FCA. When McKenzie brought her complaints to the attention of the BellSouth auditor and her supervisors, legal action was not a reasonable or distinct possibility. Although the newspaper article distributed and posted by McKenzie shows an awareness of consumer fraud, the "in furtherance of" language requires more than merely reporting wrongdoing to supervisors.
>
> \* \* \* \* \* \*
>
> In sum, we find that McKenzie's complaints about falsification of BellSouth's repair records and distribution of a newspaper article generally describing a fraud investigation by the state of Florida did not create a genuine issue of material fact regarding a "reasonable possibility" of a *qui tam* action pursuant to the FCA.

219 F.3d at 516–17.

Like the plaintiff in *McKenzie,* Plaintiff here has produced no evidence to show

that his complaints about the inadequacies of the chemistry labs were done in furtherance of an FCA action. Examining the evidence of record, it is clear that, at best, all that Plaintiff can show is that he complained several times over the course of his employment as a part-time instructor at WCCCD about the lack of chemicals or other deficiencies in the chemistry labs. Even accepting his post-deposition affidavit, which was filed after Defendants' filed their Motion for Summary Judgment, that he complained "on more than one occasion" that the condition of the chemistry labs constituted "academic fraud," he still fails to establish that his complaints were "in furtherance of" and FCA action.

As the Sixth Circuit made clear in *McKenzie*,

> In order to defeat summary judgment McKenzie must raise a genuine issue of material fact that she engaged in "protected activity," defined as ... activity with a nexus to a *qui tam* action or fraud against the United States government.

219 F.3d at 516.

Like *McKenzie*, Plaintiff here has not met this burden. Therefore, Defendants' Motion for Summary Judgment will be granted on Plaintiff's FCA retaliation claim.

### CONCLUSION

For all of the reasons set forth above in this Opinion and Order,

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment be, and hereby is, GRANTED. Accordingly,

IT IS FURTHER ORDERED that this case be DISMISSED in its entirety, with prejudice.

### JUDGMENT

The Court having this date entered an Opinion and Order granting Defendants' Motion for Summary Judgment and dismissing this case in its entirety, with prejudice, and being otherwise fully advised in the premises,

NOW, THEREFORE,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that a JUDGMENT OF DISMISSAL, WITH PREJUDICE be and, hereby is, entered.